IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) | |
| | ) | Civ. No. 08-0506-E-BLW |
| Plaintiff, | ) ) | |
| | ) | MEMORANDUM DECISION |
| v. | ) ) | |
| U.S. DEPARTMENT OF INTERIOR, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) ) | |

## INTRODUCTION

The Court has before it cross-motions for summary judgment. The issues are fully briefed and the Court has held oral argument. For the reasons explained below, the Court will grant WWP's motion in part, finding that the decision of the Interior Board of Land Appeals is arbitrary and capricious, and remanding the matter to the BLM to (1) include the Management Guidelines as mandatory Terms and Conditions, and (2) render a new decision on the Nickel Creek FFR allotment.

## LITIGATION BACKGROUND

The Nickel Creek and Nickel Creek Federal Fenced Range (FFR) allotments

**Memorandum Decision – page 1**

lie within the Owyhee Resource Area (ORA) in southwestern Idaho's Owyhee County.  The Nickel Creek allotment includes over 67,000 acres of public lands in 18 pastures, while the Nickel Creek FFR allotment contains 1,644 acres in 9 pastures.  Together, the allotments contain over 50 miles of creeks, rivers and intermittent streams, supporting about 200 acres of riparian areas, more than in any other grazing allotment in the ORA.

The allotments contain four Areas of Critical Environmental Concern (ACEC), including the Owyhee River Bighorn Sheep ACEC located in the southern end of the allotment.  The ACECs are areas within public lands specially managed to prevent irreparable damage to, among other things, fish and wildlife resources.  *See* 43 U.S.C. § 1702(a).  Also within the allotments are three Wilderness Study Areas.  The allotments are home to certain BLM "sensitive species" such as sage-grouse, bighorn sheep, redband trout, columbia spotted frog, and rare plant species.

In 1997, the BLM issued 68 grazing permits covering about 1 million of the 1.3 million public acres in the ORA.  Among those permits was a new permit for the Nickel Creek allotments, authorizing a total of 5202 AUMs for a ten-year term.

In 1999, this Court held that the BLM violated NEPA in issuing the 68 permits without documenting its decision not to prepare a supplemental NEPA

**Memorandum Decision – page 2**

review.  *See IWP v. Hahn*, CV-97-519-S-BLW.  The Court imposed four interim

measures to limit grazing damage to riparian areas that included (1) a 4-inch

riparian stubble height limit, (2) a 60% riparian utilization limit, (3) a 50% riparian

browse limit, and (4) a 10% limit on stream-bank damage attributable to livestock

grazing.  These interim measures were to govern grazing until the BLM could

complete a full NEPA analysis.

At that time – in 1999 – the ORA Resource Management Plan summarized

the condition of the allotments in the ORA and placed them in three categories:

improve, maintain, or custodial.  Due to the large number of allotments falling into

the "improve" category, the BLM prioritized the need for improvement by

designating each allotment as either a high, medium, or low priority.  The Nickel

Creek allotment was in the "improve" category and was designated as a "high

priority improve" allotment.

As the BLM proceeded with the NEPA analysis ordered by *Hahn*, it filed

status reports concerning compliance with the four interim measures.  In 2002, on

the Nickel Creek allotments, only 2 of the 11 riparian areas met the stubble height

requirement.  *See Exhibit 31*.  In 2003, only 3 out of the 9 areas met that

requirement.  *See Exhibit 53*.  The 10% limit on stream bank alteration was either

not monitored or not met at every site for both years.  *Id*.  The other two

**Memorandum Decision – page 3**

requirements had similar rates of non-compliance and non-monitoring.  *Id.* The author of the two reports – Jenna Whitlock, the ORA Field Manager – testified that the permit holders "didn't comply with the interim measures any of the three years that it was measured."  *See B20134.*

Eventually, the BLM conducted an "Assessment and Determination" to determine the condition of the Nickel Creek allotments judged under the criteria set forth in the Idaho Standards and Guidelines developed in accordance with the Fundamentals of Rangeland Health (FRH) regulations.  To prepare this Assessment, the BLM assembled an interdisciplinary team that included team leader Matt McCoy along with BLM experts in wildlife management, soil science, fisheries biology and rangeland management.

These BLM experts conducted the Assessment by comparing the condition of the Nickel Creek allotments with six standards set by the Idaho Standards and Guidelines:  (1) watersheds; (2) riparian areas and wetlands, (3) stream channel/floodplain; (4) native plant communities; (5) water quality; and (6) threatened and endangered plants and animals (and sensitive species).

For example, the water quality standard is satisfied if the surface and ground water on the allotment comply with the Idaho Water Quality Standards.  *See Exhibit 54.*  As another example, the sensitive species standard is satisfied if the

allotment contains habitat suitable to maintain a viable population of sensitive

species.  *Id*.  The Assessment's goal was to determine if the conditions on the

Nickel Creek allotments met these six standards.

   The Assessment concluded that none of these standards was met on the

Nickel Creek allotments, and that livestock grazing management was a significant

factor in that failure in many areas.  *See Exhibits 1 & 2*.  The BLM described the

Assessment's findings as follows;

> [E]xisting grazing management practices or levels of grazing use on
> public lands are significant factors in failing to achieve the standards for
> rangeland health and conform with the guidelines for grazing
> administration.  Current grazing practices do not result in adequate
> ground cover, provide periodic rest or deferment during the critical
> growth period, provide sufficient residual riparian vegetation to maintain
> riparian/wetland functions, or maintain plant vigor.

This finding triggered a regulatory duty on the part of the BLM to take appropriate

action that would result in "significant progress" toward meeting the Idaho

Standards and Guidelines before the next grazing season.  *See* 43 C.F.R.

§ 4180.2(c).  To comply with that regulatory duty, the BLM interdisciplinary team,

discussed above, met among themselves, with permit holders, and with other

interested parties.  *See EA* at p. 56.

## BLM's Two Key Strategies

   In this process, the BLM devised two key strategies to improve the condition

**Memorandum Decision – page 5**

of the allotment.  The first was a grazing rotation schedule that would allow

sensitive pastures to recover between use, and the second was a series of utilization

limitations – along the lines of the *Hahn* interim measures – that would prevent

further  degradation.

The first strategy – the grazing rotation schedule – was the result of

"frequent, regular communication" between the BLM and the permittee's

consultant, Dr. Gibson.  *See A10164.*  Dr. Gibson submitted at least three drafts to

the BLM, and the BLM "responded" to these drafts.  *Id.*

The rotation schedule divides the allotment into 3 units and moves the cattle

between pastures every month or two during the grazing season.  The rotation

pattern differs each year over a 4-year period.  The schedule was tailored to avoid

grazing during critical vegetation growth periods in consecutive years, and grazing

in riparian areas was restricted during the hot season.

BLM Fisheries Biologist Bruce Zoellick, a team member, described the

rotation schedule as follows:

> The grazing system . . . is set up so that a pasture with a stream gets
> three so-called good treatments for that stream and riparian system out
> of four years.  One out of those four years . . . the stream will be
> grazed during the hot season . . . .  So you need three good treatments
> to recover from impacts of riparian plant use and disturbance to banks
> and soils.

*See Zoellick Testimony at p. B21080.*

**Memorandum Decision – page 6**

The second strategy – the utilization limitations – includes the following grazing restrictions: (1) 40% utilization limit on native grasses in spring pastures and the Badlands ACEC, and 50% utilization limit elsewhere; (2) 30% utilization limit on bitterbrush in crucial deer winter range, and 50% elsewhere; (3) a 4-inch riparian stubble height limit on key hydric herbaceous species at the end of the growing season on several pastures, and a 6-inch riparian stubble height limit in the North Fork Juniper Woodland ACEC and at water gaps on the North Fork Owyhee River; (4) 25% riparian woody browse limit; and (5) a 10% limit on stream-bank alteration attributable to livestock.

Assuming compliance with these two strategies, the BLM concluded that total AUMs would not have to be reduced much to satisfy the regulatory mandate of 43 C.F.R. § 4180.2(c) – that is, to make "significant progress" toward satisfying the Standards and Guidelines.  Accordingly, the BLM prepared an Environmental Assessment (EA) evaluating a number of alternatives, with the BLM's proposed alternative being the implementation of these two strategies incorporated in a ten-year grazing permit that authorized AUMs roughly equal to past authorizations.

**BLM's Final Decision**

In 2003, after a public comment period, the ORA Field Manager Jenna Whitlock issued a Final Decision adopting the BLM's preferred alternative,

concluding that it would make significant progress toward achieving the Idaho Standards and Guidelines.  Whitlock issued a Finding of No Significant Impact (FONSI), and also issued ten-year grazing permits for the Nickel Creek allotments.

Plaintiff WWP challenged that Final Decision before Department of Interior Administrative Law Judge Andrew Pearlstein, who conducted a 15-day evidentiary hearing.  Based on that record, Judge Pearlstein issued a comprehensive 125-page decision in September of 2007.

**Judge Pearlstein's Decision**

Judge Pearlstein held that the Final Decision violated the Fundamentals of Rangeland Health regulations because it would not make "significant progress" toward meeting the Idaho Standards and Guidelines.  He also held that it violated NEPA for failing to (1) adequately consider the "light use" alternative proposed by WWP, and (2) failing to discuss the RMP's projection of a 30% reduction in AUMs.

In reviewing the BLM's Final Decision under the FRH – which required that the BLM make "significant progress" in improving the condition of the allotments – Judge Pearlstein found that "[t]he most significant, indeed likely determinative, issue in this proceeding centers on WWP's contention that the level of grazing use permitted on these Allotments by the Field Manager's [Final] Decision is simply

**Memorandum Decision – page 8**

too high." *See A10205.* The stocking rate was too high, in Judge Pearlstein's

opinion, for four reasons: (1) range science literature favors a lower stocking rate;

(2) altering rotation without lowering AUMs just moves around the harm but does

not cure it; (3) the BLM experts set stocking rates based on inadequate data and

unsupported assumptions; and (4) the utilization limits that might mitigate

overstocking were discretionary rather than mandatory.

With regard to the literature, Judge Pearlstein found that it "persuasively

shows" that the correct stocking rate, including an appropriate grazing intensity

and forage utilization rate, "will be much more likely to result in significant

improvement in ecological considerations on the Allotments than changing the

rotation system." *See A10206.*

His second point was that putting in place a new rotation schedule without

reducing AUMs simply moves the harm around but does little to reduce the overall

impacts of grazing: "For example, limiting hot season grazing in riparian pastures

puts heavier pressure on spring grazing during the critical growth season for

upland forage and can cause trampling of wet soils and streambanks if riparian

areas are used in the spring." *See A10227.*

His third point was that the BLM experts relied on inadequate data. The

BLM's expert consultant, Dr. Burkhardt, testified that the BLM follows a "stock,

**Memorandum Decision – page 9**

monitor, and adjust" policy that sets a stocking rate, monitors its effects, and then adjusts the rate if necessary.  *See A10210.*  However, Dr. Burkhardt "expressed disappointment in the lack of recent utilization data on the Allotments which is necessary in order to make proper adjustments over time."  *See A10210.*  Without the necessary utilization data, the BLM "failed to properly adjust," according to Judge Pearlstein.  *See A10238.*  Judge Pearlstein also found error in representations made by the BLM's Range Management Specialist John Bair that the rotation schedule reduced stocking rates when compared with historical averages.  Judge Pearlstein found that Bair's calculations of historic average use failed to include periods of rest in some pastures.  This error rendered the historic use figures artificially large, which made the rotation stock rates look good in comparison. For example, while Bair represented that the rotation schedule would reduce use in Unit 2 by 10% from historic average use, when Judge Pearlstein corrected the historic use figures, he found that the rates were "essentially the same."  *See A10222*

Judge Pearlstein was also critical of the discretionary nature of the utilization limitations.  He noted that the BLM's own experts testified that compliance with the utilization limitations was crucial to making significant progress, and he then commented on that expert testimony:

**Memorandum Decision – page 10**

> [B]y designating the utilization limits as guidelines rather than terms and conditions, BLM is at best creating a mis-impression concerning the necessity of compliance and at worst precluding full enforcement of key components of the [Final] Decision. When a utilization level such as the 40% spring pasture rate is so central to the [Final] Decision that the failure of a permittee to comply would undermine the management program, BLM must include a mechanism for enforcement. Instead, BLM has limited its ability to effectively respond to a pattern of noncompliance by labeling crucial range improvement terms as 'management guidelines' which are not apparently enforceable as terms and conditions.

*See A10218.*  Thus, a full review of Judge Pearlstein's decision shows that he relied on four different grounds to find that the Final Decision violated the FRH regulations.

Judge Pearlstein turned next to WWP's allegations that the EA violated NEPA.  Specifically, he considered the claim that the "light use" alternative proposed by WWP was not given adequate consideration in the EA.  The light use alternative placed utilization limits on certain areas, and required that cattle be moved to other areas once those limits were met.  Because this alternative depended on the forage available in any given year, the alternative contained no restrictions on AUMs or season of use.  However, Judge Pearlstein estimated that it would reduce AUMs about 30% compared to the proposed action, and that finding was not challenged by the parties.  *See A10168.*

**Memorandum Decision – page 11**

Judge Pearlstein began his analysis by pointing out that the EA "repeatedly asserted" that the light use alternative "would improve ecological conditions far more rapidly than the proposed action." *See A10230.* Judge Pearlstein held that despite these favorable factors, "the EA does not include any detailed analysis of how the light use alternative would actually work, or how its operation and costs would compare with the proposed action that became the Final Decision." *Id.* For that reason, Judge Pearlstein concluded that the EA failed to comply with NEPA's requirement that all alternatives be adequately considered.

Judge Pearlstein also concluded that the EA violated NEPA for failing to discuss the projection in the 1999 ORA RMP that grazing be reduced by 30% over time. He noted that the AUMs had undergone only a minor reduction since 1999, and that the EA's complete failure to discuss this violated NEPA.

**IBLA Decision**

Both parties appealed Judge Pearlstein's decision to the Interior Board of Land Appeals (IBLA). In December 2008, the IBLA reversed Judge Pearlstein's rulings. The IBLA held that the Final Decision would make significant progress in improving allotment conditions and hence did not violate the FRH regulations. *See C30097.* The IBLA also held that the EA and Final Decision did not violate NEPA because (1) they adequately discussed the light use alternative, and (2) the 30%

reduction in AUMs discussed in the ORA-RMP was not binding on the BLM.  The IBLA noted that the 30% figure was subject to change depending on local conditions, and that there was no evidence that "the circumstances supporting the 1999 projection [of a reduction in grazing by 30%] continued at the time of the [Final Decision]." *See C30100.*

WWP responded by filing this lawsuit seeking reversal of the IBLA decision (along with the Final Decision and EA that it affirmed) and a remand to the BLM with instructions to prepare a new lawful Final Decision for the Nickel Creek allotments.

## STANDARD OF REVIEW

The standard of review in this case is complex, raising two somewhat overlapping, but independent, layers of review. The first concerns the IBLA's review of the ALJ's decision. The second concerns this Court's review of the IBLA's decision.

With respect to the IBLA's review of the ALJ's decision, the IBLA, as a "delegate of the Secretary of the Interior, has the authority to make decisions concerning the public lands as fully and finally as might the Secretary himself." United States v. Dunbar Stone Co., 56 IBLA 61, 67 (1981). Thus, the IBLA has the authority to make a de novo review of the entire administrative record, and make

**Memorandum Decision – page 13**

its own findings of fact based on that record. *Id*. at 68.  The IBLA has recognized,

however, the propriety of deferring to the ALJ's findings "where a witness'

demeanor affects his credibility." Id. In these circumstances, where "the resolution

of disputed facts is clearly premised upon an ALJ's finding of credibility, which are

in turn based upon the judge's reaction to the demeanor of the witnesses, and such

findings are supported by substantial evidence, they ordinarily will not be

disturbed by the Board."  *See BLM v. Carlo,* 133 IBLA 206, 211 (1995).  Still, the

IBLA has reversed ALJ findings of fact even where it was based on credibility

determinations when the existence of other facts of record fatally compromised the

testimony which the ALJ found credible and relied upon. *Id.*  Where such facts do

not exist, though, the IBLA must exercise extreme caution in challenging an ALJ's

findings of fact which are premised on the demeanor of the witnesses who testified

before the ALJ.  *Id.* at *2.

Nevertheless, the IBLA's authority to make findings of fact which differ

from the ALJ's findings is not limited by the substantial evidence rule. *Id.*  The

power of the IBLA in reviewing the ALJ's decision is greater than the power of an

appellate court reviewing the decision of a trial judge, and the IBLA has all the

powers which it would have in making the initial decision.  *Id.*

With respect to this Court's review of an IBLA decision, section 706 of the

**Memorandum Decision – page 14**

APA states in relevant part that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *See* 5 U.S.C. § 706. The reviewing court must hold unlawful and set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). Thus, this Court "cannot merely substitute [its] judgment for that of the IBLA." *Baker v. United States*, 613 F.2d 224. 226 (9th Cir.1980). "[R]eview is limited to an examination of whether the decision of the IBLA was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with the law." *Id.*; *see also Lara v. Secretary of the Interior*, 820 F.2d 1535. 1540 (9th Cir.1987). In making its determination, this Court "shall review the whole record or those parts of it cited by a party . . . ." *See* 5 U.S.C. § 706.

Accordingly, in reviewing the IBLA's decision, this Court will review the entire record before it. The Court will determine whether the IBLA's decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with the law. In doing so, the Court recognizes the IBLA's authority to review the ALJ's decision *de novo*, but with the understanding that the

IBLA must exercise extreme caution in challenging the ALJ's findings of fact which are premised on the demeanor of the witnesses who testified before him.

## ANALYSIS

### Fundamentals of Rangeland Health

The Fundamentals of Rangeland Health (FRH) regulations set up a framework for evaluating and improving the ecological condition of rangeland used for grazing.  Pursuant to the FRH, BLM state directors develop regional standards for rangeland health that apply to grazing permits issued in that region. In 1997, the BLM approved the Idaho Standards and Guidelines, discussed above, that set standards for water quality, riparian areas, plant communities, and sensitive species, among other things.

As discussed, the BLM's Assessment and Determination found that none of these Idaho Standards and Guidelines was being met on the Nickel Creek allotments and that livestock grazing was a significant factor in that failure.  *See A10142.*  This finding triggered a regulatory duty on the part of the BLM to take appropriate action that would result in "significant progress" toward meeting the Idaho Standards and Guidelines before the next grazing season.  *See* 43 C.F.R. § 4180.2(c).  While the BLM's regulations did not define "significant progress," the Idaho Standards and Guidelines define it as "[m]easurable and/or observable

. . . changes in the indicators that demonstrate improved rangeland health." *See Exhibit 54* at p. 17.

The BLM set forth its plan to meet its regulatory duty in the EA and Final Decision. The regulations cited above require that plan to make "significant progress," or in other words, to lead to "measurable and/or observable changes" in the Idaho Standards on the Nickel Creek allotments.

The IBLA found that Judge Pearlstein erred in finding that the BLM's Final Decision would not make significant progress under the FRH. The IBLA characterized Judge Pearlstein's decision as holding that WWP had shown that "excessive numbers of cattle *were alone* responsible for the failure to make significant progress . . . ." *Id.* (emphasis added). According to the IBLA, WWP had failed to carry its burden of proof because its "sole reliance" on scientific literature failed to demonstrate that the Nickel Creek allotments would fail to make progress. *See C30097.*

The IBLA mis-characterized both WWP's argument and Judge Pearlstein's decision. WWP did not rely solely on scientific literature, and Judge Pearlstein did not hold that excessive cattle "were alone responsible" for poor conditions. As discussed in detail above, Judge Pearlstein's opinion on the stocking rate was based on five main factors: (1) range science literature favors a lower stocking rate;

**Memorandum Decision – page 17**

(2) altering rotation without lowering AUMs just moves around the harm but does not cure it; (3) despite BLM's representations otherwise, the rotation schedule does not reduce AUMs in comparison to historic averages; (4) the BLM set the stocking rate, according to its own expert, despite a disappointing lack of utilization data; and (5) the utilization limits that might mitigate overstocking were discretionary rather than mandatory, diluting their effectiveness.

The IBLA completely ignored the last four of these five factors.  The IBLA was particularly critical of the lack of evidence that "the particular allotments at issue" would not make significant progress under the Final Decision.  *See C30097*. However, the four factors ignored by the IBLA all relate  specifically to the Nickel Creek allotments.

While the IBLA cited its own past cases holding that the BLM was entitled to rely on its experts, it ignored Judge Pearlstein's ruling that (1) the BLM's own experts testified that the utilization limits were critical to making significant progress, (2) the BLM's Final Decision made the utilization limits discretionary rather than mandatory, (3) the BLM had failed in recent years to monitor the utilization of the Nickel Creek allotments, and (4) these factors "will contribute to the Final Decision's failure to achieve the standards for rangeland health."

In essence, the IBLA re-drafted Judge Pearlstein's decision to turn it into a

weak strawman, and then proceeded to knock it down.  The IBLA simply failed to address many of the critical points in Judge Pearlstein's analysis.

That failure, however, does not automatically render the IBLA decision arbitrary and capricious.  It may make no difference, in which case the IBLA decision should stand.  The Court must determine whether the IBLA's failure to address key points in Judge Pearlstein's decision makes any difference to the ultimate result.

## Utilization Limits – Mandatory or Discretionary?

The BLM argues that the utilization limits are mandatory in the Final Decision, and thus even if the IBLA ignored this issue, it makes no difference to the result.  The BLM reaches this result by interpreting certain language in the EA it drafted.

In the drafting of that language, the permit holders lobbied the BLM to make the utilization limitations voluntary guidelines, not mandatory terms and conditions.  *See Transcript (Vol. I)* at p. 898-99 (testimony of Matt McCoy, BLM Team Leader).  The ORA Manager, Jenna Whitlock, recalled the negotiations with the permit holders in much the same way, testifying that they did not want a mandatory stubble height requirement on their ten-year permits.  *Id*. at p. 360.

There is a substantive difference between a mandatory term and condition

and a voluntary guideline:  A violation of a mandatory "term and condition" may subject the permit holder to civil and criminal penalties, *see* 43 C.F.R. § 4140.1(b)(1)(ii), while the regulations provide no such penalty for violation of a voluntary guideline.

The Final Decision sets out the rotation grazing schedule as a "term and condition," and commands that grazing "will follow" the schedule.  *See Final Decision* at p. 6.  In contrast, the Final Decision sets forth the utilization limitations under a separate heading labeled "Management Guidelines," and merely suggests that actual utilization "should not exceed" the target percentages.

This Court has previously held that the heading "Management Guidelines" demonstrates that the listed guidelines "are goals, not requirements."  *See WWP v. Bennett*, 392 F.Supp. 2d 1217, 1228 (D.Idaho 2005).  The word "will" is a mandatory term while the word "should" is a discretionary term.  *See U.S. v. UPS Customhouse Brokerage, Inc.,* 575 F.3d 1376, 1382 (Fed.Cir. 2009) (noting the difference between mandatory terms "will" and discretionary terms like "should"); *see also Seltzer v. Chesley*, 512 F.2d 1030, 1035-36 (9th Cir. 1975) (use of term "should" in jury instructions was permissive while term "will" was mandatory); Sutherland*, Statutes and Statutory Construction,* § 57:3 ("'Should' generally denotes discretion and should not be construed as 'shall.'").  There is nothing in

the Final Decision, nor the BLM's regulatory definitions, signaling that the word "should" is used in a mandatory sense, contrary to its common usage.

Nevertheless, the BLM's counsel states in her brief that the Management Guidelines are mandatory. *See BLM Brief* at p. 9-10. Counsel points to the paragraph under the heading "Terms and Conditions" in the Final Decision:

> Grazing within the Nickel Creek and Nickel Creek FFR allotments will follow the grazing management program and rotational schedules (tables 2 through 5) outlined in this Final Decision dated November 6, 2003.

*See Final Decision* at p. 6. Counsel argues that the phrase "grazing management program" includes the "Management Guidelines," and that the Final Decision requires that grazing "will follow" those criteria. *See BLM Response Brief* at p. 9.

Yet her own client reads the language differently. During the EA's public comment period, the Juniper Mountain Grazing Association filed a protest stating that "[t]he grazing decision should clearly state that Management Guidelines are guidelines and not something that can be 'implemented.'" *See A10978.* In response, the BLM stated as follows:

> The grazing management is what is to be implemented to ensure progress is being made towards meeting Idaho Standards and Guidelines. The Management Guidelines provide measurable objectives that can help ensure that progress will be made, but would not be enforced in the manner that the grazing management system and Terms and Conditions would be.

*Id.* This reading by the BLM essentially rejects its counsel's interpretation that the

**Memorandum Decision – page 21**

Management Guidelines are mandatory and included within the phrase "grazing management program."  Instead, it appears the BLM was telling permit holders that they got what they wanted – the utilization limitations contained in the Management Guidelines would not be mandatory Terms and Conditions.  The BLM's own reading is in accord with the plain language of the Management Guidelines that merely suggest that utilization "should not" exceed the target percentages.

Nevertheless, counsel's interpretation is entitled to some deference as it represents the current position of the BLM in a decision that it drafted.  *See League of Wilderness Defenders v. U.S. Forest Service*, 549 F.3d 1211, 1217 (9th Cir. 2008).  That deference is owed "even though the agency offered the interpretation for the first time as a litigation position."  *Id*.  The agency's litigation position is "controlling unless plainly erroneous or inconsistent with the regulation."  *Id.*  In confirming an agency's litigation position as the controlling interpretation of a regulation, the Circuit noted that "there was simply no reason to suspect that the interpretation did not reflect the agency's fair and considered judgment on the matter in question."  *Id*. at 1217-18.

Here, counsel's interpretation is plainly inconsistent with the language of the Final Decision, as discussed above.  Moreover, there is reason to suspect that this

litigation position does not reflect the BLM's fair and considered judgment on the matter. During the drafting of the EA, the permit holders lobbied to make the utilization limitations non-mandatory, and afterwards, the BLM confirmed their success in that effort, as discussed above. The heading "Management Guidelines" signals that the items that follow are discretionary, not mandatory, and the use of the term "should" confirms that reading.

For all these reasons, the Court rejects counsel's interpretation of the Management Guidelines. The Court finds that they are discretionary, not mandatory.

The Court's interpretation becomes necessary here because the Court must determine whether the IBLA's failure to discuss this part of Judge Pearlstein's decision renders the IBLA decision arbitrary and capricious. *See* 5 U.S.C. § 706 ("the reviewing court shall . . . determine the meaning or applicability of the terms of agency action"). Obviously, if the Management Guidelines are to be interpreted as mandatory, the IBLA's failure to discuss this issue does nothing to weaken their decision. But if, as the Court has held, the Management Guidelines are discretionary, the Court must go on to examine how that affects the IBLA decision.

**Discretionary Guidelines & Monitoring**

The BLM and intervenors argue that even if interpreted as discretionary, the

Management Guidelines have teeth because the BLM has the authority to modify the AUMs or season of use if the BLM monitoring shows that the limits are being exceeded. But this argument assumes that the BLM is actively engaged in monitoring. The administrative record on the four interim measures for the Nickel Creek allotments shows that the vast majority of sites were not monitored. *See Exhibits 31 and 53.* This is a critical failing because as the BLM's own contractor, Dr. Wayne Burkhardt, testified, the BLM employs a "stock, monitor, and adjust" policy. *See A10210.* The BLM stocks the range with a certain amount of cattle, monitors utilization, and then adjusts the usage. *Id.* Even Dr. Burkhardt was disappointed at the lack of recent utilization data on the allotments that is necessary to make the proper adjustments under this policy. *Id.* Judge Pearlstein found that "the BLM did not consistently monitor utilization rates, which should typically occur annually." *See A10208.*

Thus, even if the violation of a discretionary limit has some consequence, the lack of consistent monitoring – a point made by Judge Pearlstein but ignored by the IBLA – makes it unlikely that the permit holders will be held accountable.

**Importance of Utilization Limits**

The administrative record shows that the utilization limits are critical for a

number of reasons.  First, the two BLM strategies – the rotation schedule and the utilization limits – are co-dependent.  Compliance with the utilization limits is critical to the success of the rotation schedule.  The EA notes that for 8 pastures, the rotation schedule authorizes livestock use during critical vegetation growth periods but finds that if the utilization limit on use of key grasses (40% or less) is "consistently met, then negative impacts to grasses would be mitigated to some extent."  *See A11013.*

Team Leader McCoy was asked if adherence to both the rotation schedule and the utilization limits was necessary to make significant progress, and he testified, "[t]hat's correct."  *See B20253.*  Team member Paul Seranko, a BLM soil scientist, testified that with regard to his area of expertise – the watershed standard of the Standards and Guidelines –  "[a]dhering to the utilization guidelines is critical to any progress actually being made under this alternative."  *B20980; see also EA at p. 35.*

The testimony that the utilization limits were critical to making significant progress went un-rebutted.


**Fundamentals of Rangeland Health**

As discussed above, the BLM's Assessment and Determination on the

Nickel Creek allotments showed that none of the applicable Standards and Guidelines were being met. That triggered a duty under the FRH on the part of the BLM to take "appropriate action" that will result in "significant progress" toward fulfilling the Standards and Guidelines. *See* 43 C.F.R. § 4180.2(c). The FRH regulations require that permits include mandatory terms and conditions "that ensure compliance with subpart 4180." *See* 43 C.F.R. § 4130.3-1.

The BLM's own experts testified that adherence to the utilization limits in the Management Guidelines was necessary to make "significant progress" under the FRH regulations. Accordingly, under the regulations just cited, the grazing permits must include the Management Guidelines as mandatory terms and conditions, just as the rotation schedule is now described.

Given that the FRH regulations deem it important enough to include the utilization limits as mandatory terms and conditions rather than mere voluntary guidelines, the failure of the IBLA to even discuss Judge Pearlstein's finding on this point renders the IBLA decision arbitrary and capricious.

**<u>Rotation Schedule</u>**

WWP seeks reversal of the IBLA decision finding that the rotation schedule will make significant progress. WWP points out that the IBLA failed to address Judge Pearlstein's analysis that the rotation schedule does not reduce AUMs over

**Memorandum Decision – page 26**

historic averages, as the BLM represented, and that the stocking rates in the rotation schedule are based on a disappointing lack of utilization data.

The Court shares WWP's concerns.  However, despite serious reservations about the adequacy of approach reflected in the Final Decision and upheld by the IBLA, the Court ultimately must conclude that the rotation schedule should stand. The errors identified by Judge Pearlstein did not affect the testimony of the BLM's experts – they were unanimous that the rotation schedule, however imperfect, together with the utilization limits, will make significant progress.  Now that the Court has held that the utilization limits must be included as a mandatory term and condition of the permits, the Court cannot substitute its own judgment for that of the BLM's experts that the two strategies – the rotation schedule and utilization limits – will make significant progress toward improving the conditions on the allotments.  Accordingly, the Court refuses WWP's demand to set aside the rotation schedule.

## Light Use Alternative

The light use alternative in the EA was proposed by WWP.  Judge Pearlstein held, as discussed above, that the EA failed to adequately discuss the light use alternative and hence violated NEPA.  The IBLA reversed that decision, holding that the EA was adequate.  The IBLA reasoned that because the light use

**Memorandum Decision – page 27**

alternative depended on available forage, and did not set AUM limits or season-of-use restrictions, it was difficult to provide an analysis of how it would actually work in any greater detail than that already provided in the EA.

WWP challenges the IBLA decision in this appeal.  The Court will begin its analysis by examining the EA's treatment of the light use alternative.

The EA evaluated the impacts of the light use alternative on the various Idaho Standards at issue, concluding that it (1) had a potential "for a greater adverse impact on the known populations of special status plants than [the proposed action]" *(see A11017)*; (2) would benefit plant communities in all four ACECs while having a greater negative impact on bighorn sheep in the Owyhee River Bighorn Sheep ACEC *(see 11020);* (3) would result in more improvement than the proposed action for noxious and invasive weed resistance *(see A11021)*; (4) would result in significant progress for "all" pastures not currently meeting the watershed Standard, as opposed to the preferred alternative that would result in significant progress for "many" pastures *(see A11024)*; and (5) would result in significant progress for "all" streams providing habitat for redband trout, as opposed to the preferred alternative that would result in significant progress for "many" streams *(see A11028)*.  Evaluating the overall environmental consequences of the light use alternative, the EA concluded that "ecological conditions would

improve at a faster rate than under [the BLM's preferred alternative]."  *See A11015.*

To the Court's untrained eye, it would appear that the light use alternative was the better choice to improve conditions on the allotments.  Nevertheless, as discussed above, the Court cannot substitute its judgment for that of the BLM.  The issue – as correctly identified by the IBLA – is whether the EA's evaluation of the light use alternative complied with NEPA standards, which require a process rather than a result.  *See Center for Biological Diversity v. U.S.*, 581 F.3d 1063, 1073 (9th Cir. 2009) (NEPA "does not mandate particular results but simply prescribes the necessary process").

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *See* 42 U.S.C. § 4332(2)(E).  NEPA's implementing regulations require an EA to include "brief discussions of . . . alternatives . . . ."  *See* 40 C.F.R. § 1508.9(b).  In short, NEPA "requires that alternatives ... be given full and meaningful consideration." *Native Ecosystems Council v. U.S.*, 428 F.3d 1233, 1245 (9th Cir. 2005).

Here, the EA contained a full discussion of the merits of the light use alternative, evaluating the alternative in light of the Idaho Standards and comparing

it to the proposed action, ultimately concluding that it would improve conditions at a faster rate than the proposed action.  While the light use alternative seems the better choice, NEPA requires not that the BLM choose any particular proposal but that the choice be based on a full evaluation of the environmental impacts.  The BLM satisfied that NEPA standard in the EA and Final Decision, and the Court will affirm the IBLA decision on this issue.

**30% AUM Reduction**

Judge Pearlstein held that the EA violated NEPA for failing to discuss the ORA/RMP's projection for the Nickel Creek allotment that it would have a 30% reduction in AUMs by this time.  The IBLA reversed that finding, holding that "there is no evidence that the circumstances supporting the 1999 projection continued at the time of the [Final Decision]."  *See C30100.*  Moreover, the IBLA held, the ORA/RMP did not require a 30% reduction and did not require the BLM to "justify deviating from that level."  *Id.*

Putting aside the IBLA's stated reasons – neither of which is persuasive – there is another reason to affirm its decision:  The EA did discuss an alternative that would reduce AUMs by 30%, and that was the light use alternative.  As just discussed, this alternative was fully addressed in the EA.  Accordingly, although the Court does not accept the IBLA's stated reasons for reversing Judge Pearlstein

on this issue, its decision must be affirmed on other grounds.

**Nickel Creek FFR Allotment**

The EA stated that under the preferred alternative, "[t]he ecological condition of upland vegetation on public lands in [the] Nickel Creek FFR pastures would remain static or possibly decrease depending on when they are used." *See A11013.* This passage was read to ORA Field Manager Jenna Whitlock during the evidentiary hearing, and she was asked by WWP's counsel, "Certainly not projecting improvement in those pastures?" *See B20125.* She answered, "No."

Based on this testimony, Judge Pearlstein concluded that the BLM's Final Decision violated the FRH regulations because the BLM was conceding that it would not make significant progress on the Nickel Creek FFR allotment. *See A10225.* The IBLA ignored this finding entirely, but did reverse the entirety of Judge Pearlstein's decision, the effect of which was to hold, *sub silentio,* that the Final Decision did not violate the FRH regulations as to the Nickel Creek FFR allotment.

The testimony showed that the preferred alternative will not make significant progress on the Nickel Creek FFR allotment, and Judge Pearlstein so found. The IBLA's failure to address that finding is arbitrary and capricious. Thus, to the extent the IBLA silently reversed Judge Pearlstein on this issue, the Court reverses

the decision of the IBLA and remands the matter to the BLM to render a new

decision with regard to the Nickel Creek FFR allotment consistent with this

decision.

## BLM Experts

Throughout this decision, the Court has deferred to BLM experts.  The rule

requiring deference assumes that the experts are applying the best science and not

pursuing their own agenda.  If the record shows otherwise, the assumptions

underlying the requirement of deference are missing and that rule must be re-

examined.  *See WWP v. U.S.,* CV-06-277-E-BLW (Memorandum Decision filed

December 4, 2007, at docket no. 118) (agency official used intimidation tactics to

reach pre-determined result).

In this case, there is an appearance of bias.  Prior to the BLM's Final

Decision, the BLM and permit holders were in "virtually continuous meetings for

two years."  *See A10231.*  In this same time period, the BLM held only two

meetings with other interested parties.  *See A10163.*  This vast disparity can be

traced back to the person the BLM was directed to hire to set up these meetings:

Dr. Wayne Burkhardt, who had previously filed affidavits on behalf of the permit

holders in the *Hahn* litigation.  *See A10162.*

The BLM's proposed action was not initially drafted by the BLM but was

proposed by a consultant hired by the permit holders, Dr. Chad Gibson.   *See*

*A10164.*  Dr. Gibson was in "frequent, regular communication with BLM staff and

BLM's contractor, Dr. Burkhardt."  *See A10164.*

There is nothing nefarious in what the permit holders were doing in this

case.  Both sides lobby extensively, and no law forbids it.  But the clear disparity in

access to the agency creates at least the appearance of bias, and warrants a close

look at any standard of review that assumes the impartiality of experts.

However, in this case the Court is bound by the record below.  Judge

Pearlstein took testimony from the experts and the decision-makers, and had an

opportunity to view their demeanor and credibility.  He concluded that "[w]hile

there may be a perception of bias favoring the grazing interests in the [consultation,

cooperation, and coordination process], it is only that – a perception without

substantial supporting evidence."  *See A10202.*  Judge Pearlstein found "no

evidence of any actual bias or inappropriate conduct in BLM's decision making

process for the Nickel Creek Allotments."  *See A10203.*

Once again, the Court is bound by the standard of review that requires

deference, but this time the deference is due to the trial judge, who had the

opportunity to view demeanor and weigh credibility.  *See United Steel Workers of*

*America v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007) (holding that administrative

**Memorandum Decision – page 33**

law judge can see and hear witnesses and is in the best position to make credibility findings). These factors are especially important in determining bias or prejudice. Judge Pearlstein's opinion is marked by impressive detail and astute observations, instilling a confidence that merits deference despite this Court's substantial concerns. For these reasons, the Court will continue to adhere to that other rule of deference – the deference due to agency experts.

## Conclusion

The Court will therefore grant in part WWP's motion for summary judgment, finding that the IBLA decision is arbitrary and capricious (1) for its failure to recognize that the Management Guidelines are voluntary, in violation of the BLM's regulations that require them to be mandatory, and (2) for silently reversing Judge Pearlstein's decision that the Final Decision regarding the Nickel Creek FFR allotment violates the FRH regulations.

This matter is remanded to the BLM to (1) include the Management Guidelines as mandatory Terms and Conditions, and (2) render a new decision on the Nickel Creek FFR allotment consistent with this decision. Assuming that the Management Guidelines will be made mandatory Terms and Conditions of the permits, the Court will deny the remainder of WWP's motion, and will also deny the motions filed by the BLM and the intervenors.

**Memorandum Decision – page 34**

The Court will issue a separate Judgment as required by Rule 58(a).



DATED:  **December 30, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge